## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.




ATTORNEY FOR APPELLANT

Paul M. Blanton
Amanda Kelly
Blanton & Pierce, LLC
Jeffersonville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of Ra.W. & R.S. (Children) and Ro.W. (Father);

Ro.W. (Father),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

November 19, 2018

Court of Appeals Case No. 18A-JT-992

Appeal from the Crawford Circuit Court

The Honorable Sabrina Bell, Judge

Trial Court Cause No.
13C01-1706-JT-3
13C01-1706-JT-4

**May, Judge.**

[1] Ro.W. ("Father") appeals the involuntary termination of his parental rights to Ra.W. and R.S. (collectively, "Children"). He argues the trial court's unchallenged findings do not support its conclusions that the conditions under which Children were removed from Father's care would not be remedied and that termination of Father's parental rights was in Children's best interests. We affirm.

# Facts and Procedural History

[2] A.S. ("Mother")[1] and Father are the biological parents of Ra.W. and R.S., born August 14, 2011, and August 3, 2012, respectively. On January 30, 2014, the Department of Child Services ("DCS") removed Children from Mother's care based on a substantiated report of substance abuse and non-compliance with a

[1] Mother voluntarily relinquished her parental rights to Children and does not participate in this appeal.

previously-agreed upon safety plan. Mother had also left Children in the care of paternal grandfather, a known methamphetamine user. Father was incarcerated, and children were placed in relative care. On January 31, 2014, DCS filed a petition alleging Children were Children in Need of Services ("CHINS").

[3] On May 15, 2014, Father admitted Children were CHINS based on the allegations in DCS's petition and the fact Father was incarcerated.[2] Father was released from incarceration on June 21, 2014. On June 26, 2014, the trial court entered an order adjudicating Children as CHINS. On July 17, 2014, the trial court entered a dispositional order that required Father to, among other things, maintain contact with DCS; refrain from criminal activity; refrain from using illegal substances; keep appointments with service providers; and visit with Children.

[4] After his release from incarceration, Father contacted DCS to schedule a child and family team meeting. Father indicated he wanted to begin services and visit with Children. In June and July 2014, Father attended two of the four scheduled visits with Children. In August 2014, Father told the DCS Family Case Manager ("FCM") he was unable to return the FCM's calls because he was "busy." (Tr. Vol. II at 237.) Father was also involved in two motorcycle accidents between June and August 2014, both of which left him with serious

---

[2] Mother did not attend the CHINS fact finding hearings, and the trial court entered an order declaring Children CHINS as to Mother by default.

injuries. Father testified he did not engage in services offered by DCS at that time because "it was way too much for [him] to handle at the time." (*Id*. at 59.)

[5] Sometime thereafter, Father completed a psychological evaluation as required by the trial court, but he did not follow through with the recommendations. Father visited with Children in September 2014, but his visits were suspended two months later due to Father's lack of compliance with services and lack of attendance at visits. Father stopped participating in services and could not be located by DCS or the trial court from approximately November 2014 to December 2016.

[6] When Father resurfaced at a hearing on December 8, 2016, the trial court learned he had been incarcerated in both Daviess and Vanderburgh counties and he had pending charges against him in Pike county for dealing in methamphetamine. On May 31, 2016, the Pike County Court sentenced Father to eight years incarcerated for the dealing conviction. Father's earliest possible release date is April 30, 2022.

[7] While incarcerated, Father did not participate in visitation with Children, and he did not attempt communication. Father participated in some treatment programs while at the Department of Correction, but he did not maintain regular communication with the FCM. DCS filed its petition to terminate Father's parental rights to Children on June 29, 2017. The trial court held fact-finding hearings on the matter on November 16, 2017; December 12, 2017; and

January 25, 2018. On April 3, 2018, the trial court entered its order terminating Father's rights to Children.

# Discussion and Decision

[8] We review termination of parental rights with great deference. *In re K.S., D.S., & B.G.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). We will not reweigh evidence or judge credibility of witnesses. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *Id*. In deference to the juvenile court's unique position to assess the evidence, we will set aside a judgment terminating a parent's rights only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *reh'g denied*, *trans. denied*, *cert. denied* 534 U.S. 1161 (2002).

[9] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. A trial court must subordinate the interests of the parents to those of the children, however, when evaluating the circumstances surrounding a termination. *In re K.S.*, 750 N.E.2d at 837. The right to raise one's own children should not be terminated solely because there is a better home available for the children, *id*., but parental rights may be terminated when a parent is unable or unwilling to meet parental responsibilities. *Id*. at 836.

[10] To terminate a parent-child relationship, the State must allege and prove:

> (B) that one (1) of the following is true:
>
> > (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
> >
> > (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
> >
> > (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). The State must provide clear and convincing proof of these allegations. *In re G.Y.*, 904 N.E.2d 1257, 1260-61 (Ind. 2009), *reh'g denied*. If the court finds the allegations in the petition are true, it must terminate the parent-child relationship. Ind. Code § 31-35-2-8.

[11] When, as here, a judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). We determine whether the evidence supports the findings and whether the findings support the judgment.

*Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference."[3] *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). If the evidence and inferences support the juvenile court's decision, we must affirm. *In re L.S.*, 717 N.E.2d at 208.

[12] Father challenges the trial court's conclusion that the conditions under which Children were removed were not likely to be remedied. Father also argues termination is not in Children's best interests.

### *Reasonable Probability Conditions Would Not Be Remedied*

[13] When assessing a parent's fitness to care for a child, the trial court should view the parents as of the time of the termination hearing and take into account the changes that have occurred during the proceedings. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. However, the trial court must also "evaluat[e] the parent's habitual patterns of conduct to determine the probability of future neglect or deprivation of [a] child." *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. Evidence of a parent's pattern of unwillingness or lack of commitment to address parenting issues and to cooperate with services "demonstrates the requisite reasonable probability" that the conditions will not change. *Lang v. Starke Cty. OFC*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*.

---

[3] Herein, Father does not challenge the trial court's findings, and thus we accept them as true. *See Madlem v. Arko*, 592 N.E.2d 686, 687 (Ind. 1992) ("Because Madlem does not challenge the findings of the trial court, they must be accepted as correct.").

[14] Father contends his actions since his most recent incarceration, including participating in parenting classes, remaining drug free, and securing a place to live and work upon release from incarceration, indicate the conditions under which Children were removed would not be repeated. In support, Father discusses two cases that dealt with the termination of parental rights for an incarcerated parent: *Rowlett v. Vanderburgh County OFC*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*, and *In re H.L.*, 915 N.E.2d 145 (Ind. Ct. App. 2009). In *Rowlett*, our court reversed the termination of a father's rights despite his incarceration because the father had participated in services during his incarceration, was six weeks away from release, had regularly communicated with his children, and had secured employment upon his release. *Rowlett*, 841 N.E.2d at 623. By contrast, in *H.L.*, we affirmed the termination of a father's rights because the father was many years from release and had not taken steps to further his education or parenting skills while incarcerated. *H.L.*, 915 N.E.2d at 150.

[15] Father claims his situation is like *Rowlett*:

> Here, the Father has obtained education while incarcerated, has participated in parenting classes, [he] remained drug free, [and] has secured a place to live and employment when he is released from prison. Despite not being offered any services by DCS since his incarceration, Father has unilaterally taken advantage of classes and courses which the DCS caseworkers testified are consistent with services DCS would have offered to Father. Father stated that the circumstances which led to DCS's involvement and his incarceration would not recur because of the understanding, insight, and knowledge he gained through the

> CLIFF program. Additionally, he expressed a willingness to take advantage of any services that DCS would be willing to offer upon his release from prison.

(Br. of Appellant at 22.) However, Father's argument ignores the facts that he has not communicated or visited with Children since September 2014, that his sobriety has been maintained as a product of his incarceration, that he has failed to maintain regular contact with DCS, and that his earliest possible release date from incarceration is 2022. The facts herein are more akin to *H.L.* than to *Rowlett*.

[16] Regarding whether the conditions under which Children were removed from Father's care would be remedied, the trial court found:

> 20. After removal of [Children] per the Dispositional Decree on July 17, 2014, [Children] were never returned to the parents' care and custody. [Children] were placed with different paternal relatives after removal before briefly being placed in foster care. [Children] have remained with maternal relative placement since June 2014.
>
> 21. Father was incarcerated in the Dubois County Jail in the early stages of the CHINS proceedings. Throughout the life of the case, Father has been incarcerated in Daviess County, Dubois County, Pike County, Vanderburgh County, and the Indiana Department of Corrections.
>
> 22. Father was released from Dubois County Jail in June of 2014 and developed a plan with the DCS Family Case Manager (FCM), Lana Tobin, to start services. DCS made referrals to service providers and scheduled visitations with [Children]. However, Father kept delaying visitation with [Children] stating

he wanted to "get settled first." By July 2014, DCS had lost contact with the Father, he had cancelled visitations, and [he] had not started services. The Father stated that he was too busy to participate in services. Father complied with an initial psychological evaluation but did not follow recommendations for treatment.

23. Between June of 2014 and October 2014, the Father had approximately five supervised visits with [Children]. The Father stated he did not want to play the role of disciplinarian with [Children]. The Father has not seen [Children] since the fall of 2014 when they were two and three years old.

24. Between June 26, 2014 and August 28, 2014, the Father was involved in two significant motorcycle accidents. DCS did not investigate the extent of Father's injuries or the recovery/rehabilitation course he was put on. The FCM did testify that she met with Father not long after second accident and that she had concerns about his ability to get around. She indicated that she believed he was prescribed pain medication. Father, she relayed, was unable to drive as a result of the injuries sustained. FCM arranged for no transportation for Father to get to and from services or to and from visitations. Father did not ask for help with transportation to and from services or visitation. FCM was unaware when Father's restrictions were lifted. Father testified he had "too much going on" to ask for help. No evidence was presented regarding Father's medical condition during this time.

25. At the permanency hearing that was held on November 13, 2014, the Court, ceased services and suspended visitation due to lack of compliance.

26. Father was arrested on or about March 3, 2015 and subsequently charged with two (2) counts of Dealing in

Methamphetamine as a level 2 and level 3 felony in Pike County. Father remained incarcerated in the Pike County Jail until he was sentenced on May 31, 2016. Father pled guilty to Dealing in Methamphetamine as a level 3 felony and was sentenced to eight (8) years at the Indiana Department of Corrections. As part of his sentence, Father was referred to participate in purposeful incarceration and, upon completion of the program, Father would be eligible for a modification of his sentence.

27. The FCM indicated that Father's participation in the purposeful incarceration program was a good thing and would be similar to and/or consistent with services that DCS would want Father to participate in. The FCM, prior to trial, had not spoken with Father's counselor at [Indiana Department of Correction] to determine Father's compliance with purposeful incarceration. Father's counselor, Kenneth Owens, testified that Father was doing well at [Indiana Department of Correction] and that he was free of mental illness, that he was participating in GED courses, substance abuse classes, passing drug tests, had plans for life after incarceration, housing, employment, rehabilitation and coping skills to prevent recidivism, had an AA sponsor, a life coach and had been taking parenting classes. Furthermore, Father had been incarcerated for over sixteen (16) months with no behavioral issues.

28. During his incarceration, DCS lost all contact with Father, and was unsure of his location until 2017. The FCM indicated no efforts were made to learn of Father's whereabouts. When DCS did learn that the Father was incarcerated at the Miami Correctional Facility, Father was transported to the Crawford County Jail, and the FCM met with the Father and the [Court Appointed Special Advocate]. The FCM showed Father pictures of [Children] and indicated [Children] did not remember him. The FCM also informed Father that the permanency plan for [Children] was termination of parental rights and discussed Father consenting to the termination.

29. Father indicated that he was willing participate with any services that DCS would offer. DCS did not offer Father any further parenting classes or substance abuse classes at that time while he was incarcerated.

30. During his incarceration, Father, never contacted DCS to inform FCM of his location. Father admitted he had FCM's contact information throughout the life of the case, and [he] had always known how to reach FCM. Father testified that during his incarceration, he was provided envelopes twice a month, and [he] would write to his family. Father's cousin would put money on a card so that Father could call his family. Father wrote to [Mother]. Father never wrote to [Children], sent cards, or [sent] any other correspondence. Father never wrote to DCS or contacted FCM.

31. Although Father was housed in the local jail for several months, he was able to bring his therapeutic community workbooks with him and complete his program. The Father's earliest possible release date is April 30th, 2022, unless his sentence is modified by the Pike County Circuit Court. Father is not guaranteed a sentence modification.

32. Father was not incarcerated from June 2014 to March 2015, a period of ten months. During that time, Father was to participate in substance abuse treatment, random drug screens, visitation, and parent aide [training]. Father was not compliant with services, failed to maintain contact with DCS, and struggled with homelessness and instability in his life. The FCM testified that throughout the life of the case, Father has never maintained a stable home. Father admits he was offered help before but he was not ready to accept it, and that he never asked DCS for help.

33. The Father testified that in the event his sentence is modified, he needs more time to "get settled" and "get on his

> feet," before he can take [Children]. Father admits he needs to learn how to care for himself before he can care for [Children], and that he does not know what [Children] need at this point.

(App. Vol. II at 9-13 (errors in original)). Father's argument is essentially an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). The trial court's unchallenged findings support its conclusion that the conditions under which Children were removed would not be remedied. *See In re L.S.*, 717 N.E.2d at 210 ("A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change.").

### *Best Interests of Children*

[17] In determining what is in Children's best interests, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re A.K.*, 924 N.E.2d 212, 223 (Ind. Ct. App. 2010), *trans. dismissed*. A parent's historical inability to provide a suitable environment, along with the parent's current inability to do so, supports finding termination of parental rights is in the best interests of the child. *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002). The recommendations of a DCS case manager and court-appointed advocate to terminate parental rights, in addition to evidence that conditions resulting in removal will not be remedied, are sufficient to show by

clear and convincing evidence that termination is in Children's best interests. *In re J.S.*, 906 N.E.2d 226, 236 (Ind. Ct. App. 2009).

[18] Father again analogizes the facts of his case to those in *Rowlett*. In *Rowlett*, our court determined termination was not in the best interest of the children because of "the positive steps [Rowlett] has taken to turn his life around for the sake of himself and his children[,]" *Rowlett*, 841 N.E.2d at 623, and because his children would continue to be in relative placement pending Rowlett's release from incarceration, "we see little harm in extending the CHINS wardship until such time as [he] has a chance to prove himself a fit parent for the children." *Id.* Father argues, because Children have been in the continued care of their maternal aunt since 2014, "[t]here is no evidence that [Children] would be harmed or suffer any kind of disservice by waiting for Father to be released from prison and given time to comply with DCS services, prove himself a fit parent, and re-establish a relationship with [Children]." (Br. of Appellant at 23.)

[19] Children have been removed from Father's care for over four years, during which Father has been incarcerated on multiple charges. Father has not seen or communicated with Children for almost four years. Regarding the status of Children in their relative placement, the trial court found:

> 35. [Children] are in relative placement where they have been since 2014, and are flourishing. [Children] are enrolled in school and involved in community and social activities.

> 36. [Court-Appointment Special Advocate] testified she has known [Children] since 2014, and believes [Children] are no longer bonded to Father due to the length of time that has elapsed since he has seen or been involved with them. . . .
>
> 37. The FCM testified that she has concerns with the Father's ability to safely parent and nurture [Children] at this point, and that Father needs to learn how to care for himself first.

(App. Vol. II at 13-14.) Father's argument is an invitation for us to reweigh the evidence and judge the credibility of witnesses, which we cannot do. *See In re D.D.*, 804 N.E.2d at 265 (appellate court cannot reweigh evidence or judge the credibility of witnesses). The trial court's unchallenged findings support its conclusion that termination is in Children's best interests. *See In re E.M.*, 4 N.E.3d 636, 648 (Ind. 2014) ("children cannot wait indefinitely for their parents to work toward preservation or reunification").

# Conclusion

[20] The trial court's unchallenged findings support its conclusions that the conditions under which Children were removed from Father's care would not be remedied and that termination was in Children's best interests. Accordingly, we affirm.

[21] Affirmed.

Baker, J., and Robb, J., concur.